[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Drain*, Slip Opinion No. 2022-Ohio-3697.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3697

THE STATE OF OHIO, APPELLEE, *v*. DRAIN, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Drain*, Slip Opinion No. 2022-Ohio-3697.]

*Criminal law—Aggravated murder—Findings of guilt and death sentence affirmed.*

(No. 2020-0652 —Submitted March 8, 2022—Decided October 19, 2022.)

APPEAL from the Court of Common Pleas of Warren County, No. 19 CR 35870.

_____

KENNEDY, J.

{¶ 1} This is a death-penalty appeal as of right.

{¶ 2} On April 13, 2019, appellant, Victoria Michelle Drain[1] assaulted Christopher M. Richardson, a fellow inmate in the Residential Treatment Unit ("RTU") at the Warren Correctional Institution ("WCI").  Two days later, Richardson died from his injuries.  Drain was indicted for aggravated murder with death specifications.  She pleaded no contest to all counts and specifications, was found guilty, and sentenced to death.

_____

1. During the pendency of this appeal, appellant obtained a legal name change from "Joel M. Drain."

{¶ 3} In this appeal, Drain raises 16 propositions of law. We reject each of them. We conclude that although significant mitigating factors exist, the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. We further conclude that the death sentence is appropriate and proportionate. Accordingly, we affirm Drain's death sentence.

## I. FACTS AND PROCEDURAL HISTORY

### A. The Investigation

{¶ 4} On April 13, 2019, State Trooper Nathan Stanfield was assigned to investigate an assault on Richardson, an inmate at WCI. When Trooper Stanfield arrived at the prison, WCI's investigator told him that a correctional officer had seen drops of blood and bloody footprints on the stairs leading up to Unit 1-C and had followed the blood trail to Drain's cell.

{¶ 5} In Drain's cell, officers found Richardson on the floor. Richardson was unconscious and there was "a large amount of blood inside the cell." Richardson was taken to the hospital. Drain surrendered and was removed from the cellblock.

### 1. Drain's First Confession

{¶ 6} After viewing the crime scene, Trooper Stanfield interviewed Drain. Trooper Stanfield administered the warnings as set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Drain acknowledged that she understood the warnings. During an interrogation lasting about half an hour, Drain expressly admitted that she had intended to kill Richardson and explained how and why she had assaulted him.

{¶ 7} On the previous day, April 12, Drain had decided to kill a particular inmate (whom she did not identify) because that inmate was a child molester. On April 13, Drain began preparing to kill the unidentified inmate.

{¶ 8} Drain initially planned to stab the unidentified inmate with a homemade knife, but decided it was taking too long to fashion and hone the knife.

Instead, Drain decided to hit the unidentified inmate with a motor from a large electric fan and then strangle him.

{¶ 9} Drain and Richardson were only casually acquainted. Drain possessed a quantity of a smokable drug known as K-2. Knowing that Richardson liked to get high, Drain invited Richardson to her cell to smoke some K-2. Drain then returned to her cell to wait for Richardson.

{¶ 10} Drain told Trooper Stanfield that her "adrenaline was just running" in anticipation of killing the targeted inmate. By the time Richardson arrived, Drain was "going crazy inside." Drain was "ready to go" and "just wanted to do something to somebody."

{¶ 11} Drain invited Richardson to sit. By this time, Drain was thinking that it would be easy to kill Richardson when he was not expecting an attack. Drain had the fan motor concealed in her pocket. Holding it by the cord, she pulled it out and hit Richardson in the head with it.

{¶ 12} Richardson went down on one knee and Drain continued to batter Richardson's head with the motor, even after the cord broke off. Drain then shoved a pencil into Richardson's eye and used her foot to drive it into his head. By then, Richardson was unconscious. Drain proceeded to strangle Richardson with the cord. When the cord broke for the second time, Drain used a cable from a television antenna and kept strangling Richardson until he stopped moving, which took three to four minutes.

{¶ 13} Drain was now angry because she could not use the motor to kill her originally intended victim, and she stomped on Richardson's throat about ten times.

{¶ 14} By this time, Drain was covered in Richardson's blood. She put on a hooded sweater to hide the blood and left the cell. Encountering another inmate, Drain told that inmate that she had "just smoked some K-2 and [that she was] fucked up and just acted like a dumbass." (Drain had not, in fact, smoked any K-2.)

### 2. Drain's Second Confession

{¶ 15} On June 1, 2019, Drain gave an unsolicited written statement about Richardson's murder to Lieutenant Joseph J. Santha Jr., a correctional officer at the Ohio State Penitentiary, where Drain was then housed. This confession differed from the story that Drain told Trooper Stanfield on April 13. Drain wrote that the April 13 version was a "vague account of the murder," while the new version was "the whole account." (Underlining sic.)

{¶ 16} Drain wrote that from the time she arrived at WCI, she had planned to kill an inmate whom she believed to be a child molester. (Drain admitted to having made several such attempts while she was in other prisons.) The inmate that Drain had selected to kill was housed in a cell near Richardson's. Drain asked Richardson to coax the chosen victim into Richardson's cell, where Drain would "confront him." Richardson was hesitant, but ultimately agreed. Drain enlisted Richardson's help because Drain believed that Richardson was easy to manipulate.

{¶ 17} However, the next time that Drain had raised the subject, Richardson refused to get involved, explaining to Drain that he did not judge people and was trying to stay out of trouble. Drain began to worry that Richardson might report her plan to the prison authorities. Drain therefore decided to kill Richardson.

{¶ 18} Drain prepared the fan motor and cord and moved the contents of her cell "into positions that [would] keep Richardson from using them * * * to make noise, or defend himself." Drain also set out three freshly sharpened pencils, which she seemingly planned to insert into Richardson's anus to "show him why all crimes are NOT the same." (Capitalization sic.) Drain then offered to share a "joint" with Richardson after dinner.

{¶ 19} When Richardson entered Drain's cell, Drain ordered him to kneel. Drain then hit him in the head with the fan motor, knocking him over. Drain asked Richardson why he would save a pedophile and then struck him again. Then Drain picked up a pencil, pulled Richardson's pants down, and threatened to "fuck him"

with it. But instead, Drain jammed the pencil into Richardson's eye and "stomp[ed] it all the way in." Drain resumed beating Richardson in the head with the fan motor until the makeshift handle broke. Drain then proceeded to stomp on Richardson's throat and strangle him with a cable until the guards began their rounds.

### 3. *The Autopsy*

{¶ 20} On April 15, 2019, Richardson died from the injuries Drain had inflicted. Dr. Mary E. Goolsby, a forensic pathologist and deputy Montgomery County coroner, performed an autopsy.

{¶ 21} Dr. Goolsby found numerous blunt- and sharp-force injuries to Richardson's head and neck, including a fractured skull, a stab wound going through Richardson's nose into his left eye socket and his brain, five puncture wounds to the head, and one puncture wound to the neck. She found hemorrhaging and contusions to Richardson's brain, from which she recovered a splintered piece of a pencil. She also found evidence of strangulation. Dr. Goolsby concluded that Richardson died from "[m]ultiple blunt force injuries and sharp force injuries of the head and neck."

### B. Trial-Court Proceedings

{¶ 22} Drain was indicted on two counts of aggravated murder. Count 1 charged Drain with the aggravated murder of Richardson with prior calculation and design, in violation of R.C. 2903.01(A). Count 2 charged Drain with the aggravated murder of Richardson while Drain was under detention for a felony, in violation of R.C. 2903.01(D). Both counts included two death specifications. Specification 1 charged that Drain committed the murder while under detention, in violation of R.C. 2929.04(A)(4). Specification 2 charged that Drain had previously been convicted of the purposeful killing of or attempt to kill another, in violation of R.C. 2929.04(A)(5). Counts 1 and 2 also included a repeat-violent-offender ("RVO") specification, in violation of R.C. 2941.149(A). Count 3 charged Drain with possessing a deadly weapon while under detention for having committed the crime

of aggravated murder, in violation of R.C. 2923.131(B) and (C)(2)(a). Drain initially pleaded not guilty.

{¶ 23} Drain subsequently waived a jury trial, and a three-judge panel was selected to hear the case. Before the panel, Drain pleaded no contest to all the counts and specifications in the indictment. After taking this plea, the panel held an evidentiary hearing as required by R.C. 2945.06 and a plea hearing as required by Crim.R. 11(C)(3). *See also State v. Green*, 81 Ohio St.3d 100, 101, 689 N.E.2d 556 (1998). In advance of the hearing, the parties stipulated to the admissibility of various items of evidence and agreed that "the rules of evidence will not bar the admission of testimony and/or documentary evidence." At trial, Trooper Stanfield was the lone prosecution witness, recounting what he had learned in his investigation. Drain's confessions, Dr. Goolsby's autopsy report, and other documentary evidence and recordings were also admitted into evidence.

{¶ 24} The panel found Drain guilty of all counts and specifications. Counts 1 and 2 were merged for sentencing, and the state elected to have Drain sentenced on Count 1.

{¶ 25} The panel then conducted a sentencing hearing and Drain presented some mitigating evidence. Her cousin Miranda Shoemaker and Drain's life-long family friend, Andrea Stanfield, each testified. Drain also made an unsworn statement. However, Drain would not allow defense counsel to present testimony from her 14-year-old daughter. Drain also instructed defense counsel not to present the mitigating evidence contained in defendant's exhibit A.

{¶ 26} The panel sentenced Drain to death for the aggravated murder of Richardson. The panel also sentenced Drain to 11 years in prison on Count 3 (possessing a deadly weapon while under detention for having committed the crime of aggravated murder), to be served concurrently to Count 1, and 10 years in prison on the RVO specification, to be served consecutively to all other sentences.

## II. VALIDITY OF JURY WAIVER AND NO-CONTEST PLEA
### A. Knowing, Voluntary, and Intelligent Character of Waiver and Plea

{¶ 27} In her ninth proposition of law, Drain contends that neither her jury waiver nor her subsequent pleas of no contest were made knowingly, voluntarily, and intelligently because, due to defense counsel's alleged failure to investigate, Drain "did not have all the relevant information concerning the available mitigation * * * and how it could be cohesively presented to a jury."

#### *1. The Jury Waiver*

{¶ 28} A jury waiver must be voluntary, knowing, and intelligent. *E.g.*, *State v. Ruppert*, 54 Ohio St.2d 263, 271, 375 N.E.2d 1250 (1978). "The purpose of the 'knowing and voluntary' inquiry * * * is to determine whether the defendant actually *does* understand the significance and consequences of a particular decision and whether the decision is uncoerced." (Emphasis sic.) *Godinez v. Moran*, 509 U.S. 389, 401, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993), fn. 12.

{¶ 29} Waiver may not be presumed from a silent record; however, if the record shows that a jury waiver was executed, the verdict will not be set aside except on a plain showing that the waiver was not freely and intelligently made. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 281, 63 S.Ct. 236, 87 L.Ed. 268 (1942). Moreover, a written waiver is presumptively voluntary, knowing, and intelligent. *United States v. Sammons*, 918 F.2d 592, 597 (6th Cir.1990); *see generally State v. Bays*, 87 Ohio St.3d 15, 19, 716 N.E.2d 1126 (1999); *State v. Lawson*, 165 Ohio St.3d 445, 2021-Ohio-3566, 179 N.E.3d 1216, ¶ 74.

{¶ 30} Drain executed and filed a written jury waiver. The waiver acknowledged that Drain had been advised that she had a right to a trial by a jury of 12, that she had a right to participate in the selection of the 12 jurors, and that for her to be convicted, the verdict of the jury would have to be unanimous. The waiver also stated Drain's understanding that if she waived a jury, a three-judge panel would hear the matter. The waiver stated that no threats or promises had been made

to secure the waiver, that Drain had discussed the waiver with defense counsel, and that Drain was satisfied with her counsels' representation.

### *2. The No-Contest Plea*

{¶ 31} "Because a no-contest or guilty plea involves a waiver of constitutional rights, a defendant's decision to enter [such] a plea must be knowing, intelligent, and voluntary." *State v. Dangler*, 162 Ohio St.3d 1, 2020-Ohio-2765, 164 N.E.3d 286, ¶ 10.

{¶ 32} "Prior to accepting a guilty plea from a criminal defendant, the trial court must inform the defendant that he is waiving his privilege against compulsory self-incrimination, his right to jury trial, his right to confront his accusers, and his right of compulsory process of witnesses." *State v. Ballard*, 66 Ohio St.2d 473, 423 N.E.2d 115 (1981), paragraph one of the syllabus, following *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). The trial court must further inform the defendant that his or her plea waives the right "to require the state to prove the defendant's guilt beyond a reasonable doubt at a trial at which the defendant cannot be compelled to testify against himself or herself." Crim.R. 11(C)(2)(c).

{¶ 33} In this case, the trial court complied with *Ballard* and Crim.R. 11(C)(2)(c) by informing Drain in open court that her no-contest plea waived her constitutional rights to a jury trial, to a unanimous jury verdict, to a trial at which the state would be required to prove Drain's guilt beyond a reasonable doubt, to confront the state's witnesses, to compel the attendance of defense witnesses, and to remain silent. And Drain stated in open court that she understood each of the rights she was giving up.

{¶ 34} Drain initiated the decision to plead no contest. Indeed, she "insisted upon it against advice of counsel, and held to it through a lengthy plea colloquy," *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 40.

In *Fitzpatrick*, we concluded on similar facts that a capital defendant's decision to plead guilty was clearly voluntary. *Id*.

### 3. Inadequate Investigation

{¶ 35} Nevertheless, Drain contends that her jury waiver and no-contest plea were not voluntary, knowing, and intelligent, because defense counsel rendered ineffective assistance by failing to perform an adequate pretrial investigation. Drain argues that counsel lacked "adequate knowledge of the relevant facts concerning the crime" and did not "understand the underlying psychological factors that led to the offense." Therefore, at the time of her waiver and plea, Drain asserts, she "did not have all the relevant information concerning the available mitigation in her case and how it could be cohesively presented to a jury."

{¶ 36} To establish ineffective assistance, Drain must show (1) that counsel's performance was deficient, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's deficient performance prejudiced the defendant, i.e., that there is a reasonable probability that, but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142-143, 538 N.E.2d 373 (1989).

{¶ 37} Ineffective assistance of counsel can affect the voluntariness of a guilty or no-contest plea when "a defendant is represented by counsel during the plea process and *enters his plea upon the advice of counsel*." (Emphasis added.) *Hill v. Lockhart*, 474 U.S. 52, 56, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). In that situation, "the voluntariness of the plea depends on whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.' " *Id*., quoting *McMann v. Richardson*, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

{¶ 38} "[W]hen a defendant claims that his counsel's deficient performance deprived him of a trial by causing him to accept a plea, the defendant can show prejudice by demonstrating a 'reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.' " *Lee v. United States*, ___ U.S. ___, ___, 137 S.Ct. 1958, 1965, 198 L.Ed.2d 476 (2017), quoting *Hill* at 59. And "where the alleged error of counsel is a *failure to investigate or discover potentially exculpatory evidence*, the determination whether the error 'prejudiced' the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." (Emphasis added.) *Hill* at 59.

{¶ 39} Neither *Hill* nor *Lee* is helpful to Drain. Drain did not plead no contest on the advice of counsel—on the contrary, in pleading no contest, Drain *rejected* counsel's advice. Nor is there any likelihood that further investigation would have led counsel to change their recommendation as to the plea—counsel had already advised Drain *against* pleading no contest.

{¶ 40} Nor does the record demonstrate a reasonable probability that Drain would have pleaded not guilty but for counsel's alleged errors. Rather, the record shows Drain's longstanding determination to plead no contest and to have the proceedings over as quickly as possible.

{¶ 41} Drain's resolve to plead no contest was consistent; she indicated her intent on January 2, 2020, at the latest, and so far as the record shows, she did not waver thereafter. On January 2, Drain wrote a letter to the trial judge stating that she wanted to plead no contest.

{¶ 42} At a hearing on February 19, 2020, Drain discussed her intent with the presiding trial judge. The judge noted his receipt of Drain's January 2 letter, and Drain acknowledged writing it. This exchange followed:

10

> THE COURT: And, you want to enter a plea of no contest to these charges?
>
> DRAIN: Yes, I do.
>
> THE COURT: And, you want to waive the presentation of any mitigating evidence, right?
>
> DRAIN: Aside from an unsworn statement from myself, yes, I do.

(Capitalization sic.) Drain resisted the idea of an additional mental-health evaluation: "By no means am I incompetent to make this decision and [Dr. Jenny O'Donnell, the defense psychologist] will say the same thing." During the February 19 hearing, the judge also stated: "If you want to choose this course of action * * * I am not going to stop you." Drain replied: "You are stopping me * * * I just want to plea[d] out." Drain insisted that she understood the law, the charges, and the consequences of her actions. She accused the trial court of prolonging the proceedings because the court "like[d] the circus down here." Drain also stated: "I told [defense counsel] a month ago on January 15th that this was how I wanted to proceed."

**{¶ 43}** Finally, after the February 19 hearing, the trial court received yet another letter from Drain. In this letter, Drain stated that she was "simply agreeing to the truth of the facts in [her] indictment and leaving the rest up to the 3 judge panel." Drain also protested further against the trial court's "delaying [her] case's resolution" and questioning her competence to make decisions.

**{¶ 44}** Finally, the record shows that the defense did perform a substantial investigation. Counsel obtained reports from a psychologist and a mitigation specialist, who interviewed Drain's mother, brother, cousin, ex-wife, and two children. The defense obtained approximately 1,900 pages of prison, youth services, educational, and court records pertaining to Drain.

{¶ 45} In *Henness v. Bagley*, 644 F.3d 308 (6th Cir.2011), the United States Court of Appeals for the Sixth Circuit described a similar investigation as "a thorough investigation into potential mitigating factors." *Id*. at 323. Defense counsel in *Henness*

> obtained Henness's school records, police records, and prison records. He spoke with Henness's mother and sisters on multiple occasions. He also discussed with Henness's wife, father, stepmother, and other individuals the possibility of testifying during the mitigation stage. Counsel also retained a psychologist, who evaluated Henness and was available to testify.

*Id*.

{¶ 46} For the foregoing reasons, we hold that Drain's decisions to waive a jury trial and enter a plea of no contest were voluntary, knowing, and intelligent. Drain's ninth proposition of law is therefore rejected.

**B. Holding Court Proceedings During the COVID-19 Pandemic**

{¶ 47} Drain's eighth proposition of law contends that the trial court violated the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution by going forward with proceedings in this case during the COVID-19 pandemic.

{¶ 48} As Drain points out, the governor declared a state of emergency on March 9, 2020. The Ohio Department of Health issued a statewide stay-at-home order on March 22, 2020, effective from March 23 through April 6, 2020. Director's Stay At Home Order, chrome-extension ://ieepebpjnkhaiioojkepfniodjmjjihl/data/pdf.js/web/viewer.html?file=https%3A%2F%2Fcoronavirus.ohio.gov%2Fstatic%2Fpublicorders%2FDirectorsOrderStayAtHome.pdf (accessed Apr. 28, 2022). The stay-at-home order was later extended

until May 1, 2020. Amended Director's Stay At Home Order, chrome-extension://ieepebpjnkhaiiooojkepfniodjmjjihl/data/pdf.js/web/viewer.html?file=https%3A%2F%2Fcoronavirus.ohio.gov%2Fstatic%2Fpublicorders%2FDirectors-Stay-At-Home-Order-Amended-04-02-20.pdf (accessed Apr. 28, 2022). On March 27, 2020, the governor signed Am.Sub.H.B. No. 197, which tolled all statutes of limitations that were set to expire between March 9 and July 30, 2020. On the same date, this court issued an administrative order tolling all time requirements "imposed by the rules of the Court and set to expire during the term of this order." *In re Tolling of Time Requirements Imposed by Rules Promulgated by the Supreme Court & Use of Technology*, 158 Ohio St.3d 1447, 2020-Ohio-1166, 141 N.E.3d 974.

{¶ 49} The trial court held proceedings in this case on April 16 and May 18, 2020. On April 16, Drain reiterated her previously stated desire to waive a jury trial and to plead no contest. On May 18, Drain entered her no-contest plea. The state presented its evidence, and the three-judge panel found Drain guilty. The penalty phase of the proceeding was then held, and at its conclusion, the panel sentenced Drain to death.

{¶ 50} Drain contends that the circumstances of the pandemic unconstitutionally forced her to choose between two fundamental rights—i.e., the right to a speedy trial and the right to an impartial jury. During a global pandemic, Drain argues, it is impossible to provide both at the same time.

{¶ 51} However, Drain has forfeited this claim. The defense did not raise this issue in the trial court. A trial court is "under no obligation to grant a continuance sua sponte." *State v. Gumm*, 73 Ohio St.3d 413, 428, 653 N.E.2d 253 (1995). And a defendant's failure to raise an issue at trial forfeits all but plain error on review. *See, e.g.*, *State v. Issa*, 93 Ohio St.3d 49, 56, 752 N.E.2d 904 (2001).

{¶ 52} To demonstrate plain error, an appellant must show (1) that there was an error, (2) that the error was "plain," i.e., obvious, and (3) that the error

affected the appellant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). To show that an error affected an appellant's substantial rights, he or she must show "a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." (Emphasis sic.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. Therefore, the appellant must show "that the probability of a different result is 'sufficient to undermine confidence in the outcome' of the proceeding." *United States v. Dominguez Benitez*, 542 U.S. 74, 83, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004), quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. Here, Drain fails to show plain error.

{¶ 53} Drain argues that had she elected a jury trial, the potential jurors would have been "reasonably likely to be concerned about their risk of exposure to the virus." This concern, Drain argues, had the potential to "impair the jury's ability to remain fair and impartial" because jurors would want to complete deliberations as quickly as possible to minimize their risk of infection; this temptation would interfere with their ability to "properly consider and deliberate on the evidence." Drain also suggests that jury pools summoned during a pandemic would not represent a fair cross-section of the community. As a result, Drain contends, her ability to make "informed" choices about waiving a jury trial, pleading no contest, and declining to present mitigating evidence was "hampered." These conjectures fall far short of establishing plain error.

{¶ 54} Moreover, the logic of Drain's argument seems to require that all criminal proceedings be suspended until either the pandemic is over or perhaps until its severity has lessened to a time in which social-distancing protocols are unnecessary. But to the contrary, the chief justice has stated that trial judges have the authority to grant continuances "*on a case-by-case basis* without violating speedy-trial requirements." (Emphasis added.) *In re Disqualification of Fleegle*, 161 Ohio St.3d 1263, 2020-Ohio-5636, 163 N.E.3d 609, ¶ 7. Also, "[t]he grant or

denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge." *State v. Unger*, 67 Ohio St.2d 65, 425 N.E.2d 1078 (1981), syllabus. Drain makes no showing that the trial court abused its discretion by proceeding under the circumstances of this case.

{¶ 55} Finally, the record does not demonstrate prejudice. Nothing in the record suggests the existence of a reasonable probability that Drain's decisions to waive a jury trial, plead no contest, and partially forgo mitigating evidence were affected by the existence of the pandemic.

{¶ 56} Drain emphatically expressed her wish to plead no contest as early as January 2, 2020, long before the governor's proclamation. She told her defense counsel of her decision on January 15, 2020. During the February 19 hearing, Drain expressly stated in open court that she wanted to plead no contest and waive all mitigation, with the exception of providing an unsworn statement.

{¶ 57} Therefore, the record shows that Drain's initial decisions to forgo a jury trial, plead no contest, and waive much of her mitigation predated—and hence could not have been affected by—the governor's March 9, 2020 emergency order. Nor does anything in the record suggest that the ongoing pandemic affected any of Drain's subsequent decisions. Therefore, Drain fails to show that she was prejudiced by the trial court's proceeding with the plea, evidentiary hearing, and sentencing during the pandemic. Drain's eighth proposition of law is rejected.

### III. EVIDENTIARY ISSUES

#### A. Inadmissible Evidence

{¶ 58} Drain's fifth proposition of law contends that the trial court improperly permitted the state to introduce inadmissible evidence—specifically, hearsay and improper opinion—as a basis for the court's determination of guilt under Crim.R. 11(C)(3).

{¶ 59} During the hearing, the state adduced the testimony of Trooper Stanfield, who had investigated Richardson's murder. Having already stipulated

that "the rules of evidence [would] not bar the admission of testimony and/or documentary evidence," the defense did not object to Trooper Stanfield's testimony at any point.

{¶ 60} Trooper Stanfield was the only live witness at the evidentiary hearing, and his testimony related various facts that he had learned from others. For instance, he repeated the conclusions of the deputy coroner who had performed the autopsy on Richardson. He also testified that he had seen blood in various places in the unit, such as on the stairs and in Drain's cell. Drain argues that this testimony was improper because no foundation was laid for Trooper Stanfield's ability to identify blood. *But see State v. Stout*, 42 Ohio App.3d 38, 41-42, 536 N.E.2d 42 (12th Dist.1987) (a police officer's lay opinion that a stain in a photograph appeared to be blood was admissible; the officer's opinion was based on his perception and was helpful to the determination of a fact in issue).

{¶ 61} When a defendant pleads guilty or no contest to aggravated murder in a capital case, the three-judge panel is nevertheless required to examine witnesses and to hear any other evidence that is properly presented by the state to make a Crim.R. 11(C)(3) determination beyond a reasonable doubt as to the defendant's guilt. *State v. Green*, 81 Ohio St.3d 100, 104-105, 689 N.E.2d 556 (1998); *State v. Post*, 32 Ohio St.3d 380, 392, 513 N.E.2d 754 (1987), *overruled in part on other grounds by State v. McDermott*, 72 Ohio St.3d 570, 651 N.E.2d 985 (1995), syllabus. *See also* R.C. 2945.06 (when a defendant pleads guilty to aggravated murder, the three-judge panel "shall examine the witnesses [and] determine whether the accused is guilty of aggravated murder or any other offense").

{¶ 62} Citing R.C. 2945.06, Drain contends that when a three-judge panel examines witnesses, the state's presentation of evidence must conform to the Ohio Rules of Evidence. Therefore, Drain argues that the trial court erred by "determining that the rules of evidence were not required at Drain's plea hearing" and by "adopting a procedure in which the rules of evidence did not apply at all."

{¶ 63} But Drain's argument utterly ignores the fact that she stipulated to the admissibility of the state's evidence. Nothing in the Ohio Rules of Evidence precludes the parties in a criminal case from stipulating to the admissibility of otherwise inadmissible evidence. Indeed, we have held that stipulations made by the accused or by defense counsel in the presence of the accused are binding. *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 41, quoting *Post* at 393. The trial court did not err by applying a stipulation that had been agreed to by the parties. Accordingly, we reject Drain's fifth proposition of law.

### B. Prosecutorial Misconduct

{¶ 64} Drain's seventh proposition of law contends that the prosecutor committed misconduct by introducing state's exhibit Nos. 37, 38, and 40. State's exhibit No. 37 is a letter written by Drain on May 27, 2019, to the Warren County prosecuting attorney. State's exhibit No. 38 is an incident report from the Ohio State Penitentiary that recounts the statements that were made by Drain to a correctional officer. State's exhibit No. 40 is a DVD of witness interviews conducted by Trooper Stanfield and another state trooper.

{¶ 65} Drain contends that these exhibits contained irrelevant and prejudicial information about Drain's character, including prior crimes, "bad acts," and pejorative descriptions of Drain's character, such as "animalistic," dangerous, and calculating. Although the defense failed to object to any of these exhibits in whole or in part, and in fact stipulated to their admissibility, Drain contends that their admission was plain error.

{¶ 66} The plain-error rule does not apply here. "Agreements, waivers and stipulations made by the accused, or by the accused's counsel in his presence, during the course of a criminal trial are binding and enforceable." *Post*, 32 Ohio St.3d at 393, 513 N.E.2d 754. Moreover, a party may not " 'take advantage of an error which he himself invited or induced.' " *State v. Campbell*, 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000), quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford*

*Motor Co.*, 28 Ohio St.3d 20, 502 N.E.2d 590 (1986), paragraph one of the syllabus. By stipulating to the admissibility of the exhibits, Drain invited the error she now alleges. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 86; *State v. Totarella*, 11th Dist. Lake App. No. 2002-L-147, 2004-Ohio-1175, ¶ 38; *State v. Abercrombie*, 12th Dist. Clermont App. No. CA2001-06-057, 2002-Ohio-2414, ¶ 27-28. Drain may not now argue that the error she invited was plain error. *State v. Rohrbaugh*, 126 Ohio St.3d 421, 2010-Ohio-3286, 934 N.E.2d 920, ¶ 10. We therefore reject Drain's seventh proposition of law.

## IV. INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIMS

### A. Presumed Prejudice

{¶ 67} Drain's second and third propositions of law contend that defense counsel rendered ineffective assistance. To establish ineffective assistance, Drain must show (1) that counsel's performance was deficient, i.e., that counsel's performance fell below an objective standard of reasonable representation, and (2) that counsel's deficient performance prejudiced the defendant, i.e., that there is a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland*, 466 U.S.at 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674; *Bradley*, 42 Ohio St.3d at 142-143, 538 N.E.2d 373.

{¶ 68} However, before addressing those propositions, we must address Drain's fourth proposition of law, which contends that no showing of prejudice is needed to establish ineffective assistance in this case. Quoting *United States v. Cronic*, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), Drain asks us to presume prejudice because " 'counsel entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing.' " Among other claims, Drain contends that defense counsel "allowed" her to plead no contest, failed to conduct a "full and complete" mitigation investigation, did not develop "rapport" with Drain, waived her right to be physically present in court during some proceedings, failed to present what mitigating evidence they possessed, failed to ensure that the

Rules of Evidence were enforced in the Crim.R. 11(C)(3) plea hearing, and did not object to the imposition of a sentence for the RVO specification. With all these alleged failures, Drain claims, "it was as if [she] had no counsel at all."

{¶ 69} But to trigger *Cronic*'s presumption of prejudice, "the attorney's failure must be complete." *Bell v. Cone*, 535 U.S. 685, 697, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). *See also State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, 71 N.E.3d 180, ¶ 100. The record must show that defense counsel "failed to oppose the prosecution throughout [a particular] proceeding as a whole," not merely that they "failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind." *Bell* at 697.

{¶ 70} Certainly, defense counsel did not completely fail to test the state's case. Far from "allowing" Drain to plead no contest, they advised her against it. Given that Drain was intent on doing so, and given the strength of the state's evidence—including two detailed confessions and the fact that Richardson was found beaten and strangled in Drain's bloodstained cell—counsel could do little to test the prosecution's case for guilt on the aggravated-murder charges.

{¶ 71} As for sentencing, defense counsel did perform a mitigation investigation, as we have already discussed in relation to Drain's ninth proposition of law. They obtained a mental-health evaluation, procured interviews with members of Drain's family, and acquired approximately 1,900 pages of information about Drain's life. They did not introduce this material during the penalty phase, because Drain had instructed them not to. They did, however, call two witnesses who testified to Drain's redeeming qualities, and they made a closing argument.

{¶ 72} Defense counsel's efforts did not amount to a complete failure to subject the state's case to adversarial testing. We therefore reject Drain's fourth proposition of law and apply *Strickland*'s prejudice prong, *id*., 466 U.S.at 687-688,

694, 104 S.Ct. 2052, 80 L.Ed.2d 674, to Drain's second and third propositions of law.

### B. Failure to Present Mitigating Evidence

{¶ 73} Drain's second proposition of law contends that defense counsel rendered ineffective assistance as to the penalty phase of the proceeding. Principally, Drain contends that defense counsel were constitutionally ineffective because they failed to present the available mitigating evidence contained in defendant's exhibit A during the penalty phase.

{¶ 74} After the defense presented its penalty-phase evidence and Drain made her unsworn statement, defense counsel informed the trial court that they had more evidence, which Drain had forbidden them to use. They asked that this evidence be placed in the record under seal:

> [Defense counsel]: Your Honor, as [Drain] indicated in this unsworn statement, there is other information that we believe would be mitigation on [her] behalf. We * * * have what we would mark as Defendant's Exhibit A, that we would ask to be admitted to the record under seal.
>
> THE COURT: But not for the purpose of considering the sentence—I'm a little unclear on what it is you're asking.
>
> [Defense counsel]: [Ms.] Drain has indicated * * * that [she] does not want it presented, as [she] referenced in [her] statement. It's our desire that we would like to have it admitted into the record under seal, just as an exhibit. Certainly would be nothing that would be deliberated by the Court, but at least it's made part of the record.

(Capitalization sic.) The trial court agreed to accept the exhibit under seal.

**{¶ 75}** Drain argues that because she did not *completely* waive mitigation, she had no right to control counsel's decisions regarding *what* mitigation to present. Therefore, she contends, counsel were obliged to present the mitigating evidence that their investigation had developed. However, this is incorrect. "[T]he Constitution does not prohibit a competent capital defendant from waiving the presentation of mitigation evidence." *Tyler v. Mitchell*, 416 F.3d 500, 504 (6th Cir.2005). Hence, "[a]n attorney does not render ineffective assistance by declining, in deference to a client's wishes, to present mitigating evidence." *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 100.

**{¶ 76}** Drain also contends that she wanted only certain evidence withheld: evidence concerning her "dysfunctional childhood" and the testimony of her daughter. Hence, she argues, defense counsel were at least obliged to introduce anything in defendant's exhibit A that did not pertain to her dysfunctional childhood.

**{¶ 77}** Drain's assertion that she wanted to withhold *only* her daughter's testimony and her dysfunctional childhood is inconsistent with the record. To begin with, defense counsel specifically represented to the court that Drain had instructed them not to present defendant's exhibit A: "[Drain] has indicated * * * that [she] *does not want it presented*, as [she] referenced in [her] statement." (Emphasis added.)

**{¶ 78}** Significantly, Drain did not protest or contradict counsel's statement in any way. Dr. O'Donnell's competency report remarks on Drain's insistence on "control[ling] what information was presented" during the penalty phase. It is difficult to believe that Drain would have let counsel's statement pass without comment if it did not reflect Drain's desires.

**{¶ 79}** Yet Drain argues that her unsworn statement specifically mentioned only her daughter and her "dysfunctional childhood" as matters that she wanted withheld from the penalty-phase hearing. In her unsworn statement, Drain said:

My defense team has tirelessly tried to convince me to allow my fourteen year old daughter to testify during these mitigation proceedings, but I've elected to block these attempts because I'd rather be sentenced to death than to use the only part of me that's truly innocent and good to elicit anyone's empathy or sympathy. My daughter has absolutely nothing to do with my criminal behavior, my faults or my shortcomings and I refuse to allow her to be used as a human shield or a way to humanize me.

I've also decided to not allow my defense team to present testimony or evidence of my dysfunctional childhood or upbringing. I see no true relevance in rehashing the traumas I went through as a child, so many years after the fact.  * * * I feel the issues of my life lessons hold very little, if no weight at all in my present situation.

**{¶ 80}** She asks us to infer that these items were the *only* matters she wanted to withhold—leaving defense counsel free to introduce any other mitigating evidence.

**{¶ 81}** Of course, the fact that Drain mentioned two specific types of mitigation as being withheld does not contradict counsel's representation to the trial court that Drain wanted all of defendant's exhibit A withheld.  Therefore, if Drain's argument were based on a fair reading of her unsworn statement, we would still find this argument to be a weak one.

**{¶ 82}** But Drain's argument is based on a selective reading of the unsworn statement.  Drain ignores what she said near the end of her statement: "I'm not offering up some fake hypothetical or *far-fetched medical mental health excuses. I've not attempted to justify my behavior or pretend of* [sic] *any mental defects*." (Emphasis added.)  This refutes Drain's contention that counsel were "prevented

only from presenting testimony by Drain's daughter and evidence of Drain's childhood." On the contrary, Drain made a specific point of—indeed, seems to have taken pride in—her refusal to present any "medical mental health excuses."

{¶ 83} And this refusal was wholly consistent with the central theme of Drain's unsworn statement: her complete acceptance of personal responsibility and refusal to ask for sympathy. Consider how her statement began:

> [T]his is the time most people in similar circumstances may offer up some type of empty apology or make a pathetic plea for forgiveness while *trying to capture the Court's sympathy* by presenting all the troubles of my childhood *and past troubles*. I * * * have decided to spare everyone involved of [sic] those fake formalities * * *.
>
> First and foremost, I stand before you today accepting full responsibility. Not only for the murder of Christopher Richardson, but for everything I've done in the past or will do in the future, good or bad. I myself am responsible for all of my words, actions, successes[,] and failures. I blame nothing on no one for who I am and the things that I've done.

(Emphasis added.) We find in Drain's unsworn statement no basis to question counsel's express representation that Drain had instructed them not to introduce defendant's exhibit A.

{¶ 84} In addition, the record contains several references to Drain's desire of withholding mitigating evidence—before both the penalty-phase hearing and before Drain had decided to plead no contest. On November 14, 2019, defense counsel informed the court that he had discussed mitigation with Drain, including counsels' "work with a mitigation specialist and an investigator," and that Drain had refused—against counsel's advice—to authorize the release of information to

the mitigation specialist.  Drain confirmed this.  Drain later agreed to sign the release forms.

{¶ 85} In Drain's January 2, 2020 handwritten letter to the trial court, she stated: "After this court has determined I am fully capable, I'd respectfully ask this court to allow my plea of no contest, *and waiver of mitigation* to be well taken, and we can move forward accordingly with the 3 judge panel."  (Emphasis added.)  In a subsequent letter, Drain stated that she was not "trying to force a death *or a life sentence*," but was "simply agreeing to the truth of the facts in [her] indictment, and *leaving the rest up to the 3 judge panel*.  No more, no less."  (Emphasis added.)

{¶ 86} At the February 19 hearing, Drain discussed her request with the presiding trial judge.  The judge noted receiving Drain's January 2 letter, and Drain acknowledged writing the letter.  The following exchange then occurred:

> THE COURT: And, you want to enter a plea of no contest to these charges?
>
> [DRAIN]: Yes, I do.
>
> THE COURT: And, you want to waive the presentation of *any* mitigating evidence, right?
>
> [DRAIN]: *Aside from an unsworn statement from myself, yes, I do*.

(Emphasis added and capitalization sic.)  This is difficult to square with Drain's current assertion that she left defense counsel free to introduce any mitigation as long as that mitigating evidence did not touch on her childhood or require testimony from her daughter.

## C. Other Ineffective-Assistance Claims

{¶ 87} In the remainder of her second proposition of law and in her third proposition of law, Drain offers several other ineffective-assistance claims. None has merit.

### 1. Delay in Starting Investigation

{¶ 88} Drain contends that counsel were ineffective because they failed to begin the mitigation investigation within "a reasonable time," "as soon as they were appointed to the case," or "immediately."

{¶ 89} Counsel were appointed on August 30, 2019. On September 20, 2019, they filed a motion requesting funds for a defense mitigation specialist. The trial court granted the motion on September 27, 2019. It appears that the mitigation specialist began interviewing members of Drain's family on January 18, 2020.

{¶ 90} Drain fails to cite anything in the record to show that it would have been possible for the mitigation specialist to begin the interviews any sooner than she did. Drain simply asserts that "the delay * * * is unexplained in the record." But the burden is on the defendant to establish the elements of a *Strickland* claim. "When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674. Pointing to matters that are "unexplained in the record" does not meet Drain's burden to establish deficient performance.

{¶ 91} Nor does Drain show prejudice. Drain claims that delay in beginning the investigation prejudiced her because as early as January 2, 2020, before the family's interviews began, Drain "had already given up" and decided to waive a jury trial and plead no contest. Therefore, Drain alleges, she made these decisions without the benefit of knowing what mitigating evidence the investigation might disclose.

{¶ 92} However, Drain's January 2 decision to waive a jury trial was not irrevocable. On April 16, 2020, the trial court explained to Drain: "[Y]ou have the right to withdraw this jury waiver at any time before the trial begins." If Drain's decisions were affected by a lack of information concerning available mitigation, she could have changed her mind upon learning what mitigation was available.

{¶ 93} In fact, the record does not suggest that Drain's decisions on waiver and pleading were affected by any lack of information about mitigating evidence. At the mitigation hearing, Drain indicated that—although by then she knew what evidence defense counsel had uncovered—she still did not wish to present mitigating evidence beyond her own unsworn statement and the testimony of two witnesses. Drain's unsworn statement disclaimed any desire to "capture the Court's sympathy by presenting all the troubles of my childhood and past troubles." Drain continued:

> I've also decided to not allow my defense counsel to present testimony or evidence of my dysfunctional childhood or upbringing. I see no true relevance in raising the traumas I went through as a child, so many years after the fact. * * * I feel the issues of my life lessons hold very little * * * weight * * * in my present situation.

Defense counsel affirmed that Drain had "indicated [she] [did] not want [mitigating evidence] presented, as [she] referenced in [her] statement." Therefore, Drain has not shown that she was prejudiced by any delay in the investigation.

### 2. Insufficient Investigation

{¶ 94} Next, Drain argues that defense counsel failed to investigate mitigating evidence identified in Dr. O'Donnell's report and the records counsel had obtained before the Crim.R. 11(C)(3) hearing. The records contain references to childhood sexual abuse of Drain, to Drain's gender dysphoria and other mental-

26

health diagnoses, to Drain's history of substance abuse, and to Drain's troubled childhood. Even though the defense had amassed some 1,900 pages of material, Drain contends that this should have been but the starting point of counsel's investigation. However, as we said in discussing Drain's ninth proposition of law, defense counsel conducted "a thorough investigation into potential mitigating factors," *Henness*, 644 F.3d at 323.

{¶ 95} Moreover, Drain's claim that the investigation was inadequate is based on the *lack* of evidence that counsel investigated further. But *Strickland*, 466 U.S. at 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674, allocates the burden of showing ineffective assistance to the defendant; we " 'cannot infer a defense failure to investigate from a silent record,' " *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 226, quoting *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 244. Ultimately, then, Drain's failure-to-investigate claim rests on speculation.

{¶ 96} Finally, even if counsel's investigation were deficient, a defendant who "prevented counsel from presenting the mitigating evidence available to them" may not claim prejudice. *Henness* at 323. Drain "would not allow [defense counsel] to introduce the mitigating evidence they discovered" and hence "cannot establish prejudice" from their alleged failure to investigate further. *Id.*

### 3. Failure to Build Rapport with Client

{¶ 97} Drain contends that defense counsel failed to "build a sufficient rapport" with her. However, "[t]he Sixth Amendment does not guarantee 'rapport' or a 'meaningful relationship' between client and counsel." *State v. Henness*, 79 Ohio St.3d 53, 65, 679 N.E.2d 686 (1997), quoting *Morris v. Slappy*, 461 U.S. 1, 13-14, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983).

{¶ 98} Drain contends that counsel, although aware of Drain's gender dysphoria, showed disrespect for her by using male pronouns, referring to her as "Mr. Drain," and failing to protest when the trial court and opposing counsel did

likewise.  But Drain overlooks that (as reflected in Dr. O'Donnell's evaluation) she asked Dr. O'Donnell and the defense team to use "masculine pronouns and naming conventions."

### 4. Failure to Obtain Medications

{¶ 99} Drain contends that her counsel made no attempt to obtain antianxiety medications for her.  The record shows that Drain has a history of refusing to take such medications as prescribed, but she told Dr. O'Donnell "if [she] could get something for anxiety and not feel that it caused [her] to be vulnerable to others, [she] would consider taking it."  Notably, Drain does not state what medications counsel should have obtained or how counsel were to obtain them.  Furthermore, nothing in the record shows that Drain would have taken a different medication if one had been obtained; she told Dr. O'Donnell only that she "would consider" taking one.  Drain's argument fails to establish either deficient performance or prejudice.

### 5. Failure to Ameliorate Conditions of Confinement

{¶ 100} Drain also contends that counsel did nothing to ameliorate the conditions of her confinement.  Drain complained that the restraints and security procedures involved with being transported from the state penitentiary to Warren County for court appearances were uncomfortable.  During a pretrial conference, defense counsel brought Drain's complaints to the trial court's attention and asked whether Drain could be permitted to attend such conferences remotely to minimize the number of trips required.  The court determined that Drain could appear remotely, if she wished, at pretrial sessions involving nonsubstantive matters.  Drain exercised this option twice.  During these sessions, one of Drain's two attorneys was with Drain at the penitentiary, while the other was in court.

{¶ 101} Drain contends that attending these sessions remotely was prejudicial because she could not communicate privately during the hearings with the defense attorney in the courtroom.  Instead of arranging for remote appearances,

Drain argues, counsel should have asked the trial court to order that Drain either be confined locally or "be provided some sort of accommodation" as to security procedures.

{¶ 102} However, both pretrials at which Drain appeared remotely were brief status conferences in which defense counsel simply updated the court on such matters as discovery, trial preparation, and motions. No evidence was presented on either occasion. And no prejudice can be gleaned from the record.

{¶ 103} Drain contends that her counsel were ineffective for allowing her to waive a jury trial and plead no contest without a "complete" investigation of the case, especially as to mitigation. However, as we discussed in the section above in relation to Drain's ninth proposition of law, counsel did investigate mitigation, and nothing in the record shows that their investigation was less than adequate or that any more evidence existed.

### 6. Failure to Plea-Bargain

{¶ 104} Drain contends that defense counsel should have tried to plea-bargain with the state "for a sentence less than death." Again, Drain cites nothing in the record to show that her counsel did *not* try to plea-bargain. Drain says only that "there is no indication in the record that there were any plea negotiations at all." Drain's argument again misallocates the burden of persuasion: in a *Strickland* claim, the defendant has the burden of showing that counsel performed deficiently. *Strickland*, 466 U.S. at 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674.

### 7. Failure to Seek a Stay

{¶ 105} Drain contends that counsel were ineffective for failing to seek an indefinite stay of the proceedings due to the ongoing COVID-19 pandemic. However, Drain fails to show a reasonable probability that there would have been a different result had counsel requested a stay. Drain contends that there is a reasonable probability that she would have changed her mind and opted to go to trial had counsel obtained a stay. This is highly speculative, however, especially as

Drain initially decided to plead no contest before the governor's emergency declaration. (*See* discussion of Drain's eighth proposition of law.)

### 8. Stipulations

{¶ 106} Drain contends that defense counsel "stipulated to irrelevant and prejudicial information and failed to make a clear and adequate record of what they were stipulating to." On the contrary, the record is clear. On April 17, 2020, the trial court put on an entry and order setting the case for trial. This order memorialized the stipulations as follows:

> The parties agreed to the admissibility, subject to objections for relevance, of the following evidence without further foundation:
>
> 1) The police report and investigatory reports of the Ohio State [Highway] Patrol;
>
> 2) Witness statements;
>
> 3) The recorded audio/video statement of [Drain];
>
> 4) Letters and correspondence from [Drain];
>
> 5) Investigative documents from the Ohio Department of Rehabilitation and Corrections [("DRC")], including administrative reports or Rules Infraction Board proceedings;
>
> 6) Crime scene photographs and/or video;
>
> 7) The coroner's report and autopsy photos;
>
> 8) Laboratory reports regarding scientific testing of items, including tangible evidence recovered from the scene;
>
> 9) Tangible evidence recovered from the scene;
>
> 10) Medical records of the alleged victim;
>
> 11) Pleadings from the Hancock County case involving [Drain], including but not limited to the indictment, plea or verdict entry and judgment entry of sentence;

12) Pleadings from the Florida case involving [Drain], including but not limited to the indictment, plea or verdict entry and judgment entry of sentence.

The parties also stipulated to the following facts:

13) On or about April 13, 2019, [Drain] was under detention.

14) On or about April 13, 2019 and previously to this allegation, [Drain] was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another.

15) [Drain] is the person referenced in the pleading in the Hancock County and the Florida cases.

16) To the qualifications of Dr. Jenny O'Donnell and the fact that she is qualified to render an expert onion on those matters within her field of experience.

* * *

For planning purposes only, the State of Ohio shall be prepared to go forward with the presentation of evidence at the trial phase with the expectation that this evidence will not be challenged and the rules of evidence will not bar the admission of testimony and/or documentary evidence.

{¶ 107} Drain complains that the stipulations are set forth in terms of "general categories." But she offers no explanation of why that matters. She cites no authority to support her theory that defense counsel are required to "put on the record * * * what exactly the stipulations entailed beyond mere broad categories." Nor does she suggest any criteria by which a court could determine whether a stipulation is overly broad.

{¶ 108} Drain notes that state's exhibit No. 38, Lieutenant Santha's incident report from the state penitentiary, was admitted pursuant to the stipulations. This

document contained Drain's June 1, 2019 written confession to Richardson's murder. According to Drain, state's exhibit No. 38 "exemplifies the problem" because it is unclear whether the incident report was admitted as a State Highway Patrol investigatory report under stipulation No. 1 or as a DRC investigative document under stipulation No. 5.

{¶ 109} Drain does not explain how a report from the state penitentiary could possibly be an investigatory report from the State Highway Patrol. And even if the report may have been admissible under two of the stipulations, Drain does not explain how that circumstance would affect its admissibility or what conceivable prejudice could have resulted.

{¶ 110} Drain also complains that the scope of the term "witness statements," as used in the stipulations, is unclear because it could include "written statements signed by the witnesses, investigative write-ups of witness interviews with police, [or] audio- or videotaped oral statements of evidence." But again, Drain fails to show why these distinctions matter, especially in the context of a no-contest plea.

{¶ 111} Finally, Drain contends that defense counsel were ineffective because they failed to "challenge the State's case." This argument is based on counsel's stipulation to the admissibility of the state's evidence through the testimony of Trooper Stanfield.

{¶ 112} Drain points out that Trooper Stanfield testified to facts he had learned from the witnesses he interviewed, such as how correctional staff discovered Richardson, what the first responders saw at the crime scene, and what Drain said to correctional staff at the time. Coming from Trooper Stanfield, as Drain notes, this testimony was hearsay. Trooper Stanfield also testified as to the results of DNA tests on certain items and the conclusions of the autopsy as to Richardson's cause of death; not only was this hearsay, it also involved matters that would normally require expert testimony.

{¶ 113} Of course, this was a no-contest plea, and such a plea constitutes an admission of the facts contained in the indictment. *See* Crim.R. 11(B)(2). However, when a defendant pleads no contest in a capital case, the state must still adduce evidence of guilt and the trial court must still determine whether the defendant is guilty of aggravated murder and of the specifications.

{¶ 114} Nevertheless, Drain has not established that her counsel's stipulating to the admissibility was deficient performance or that she was prejudiced thereby. Trooper Stanfield's testimony was supported by abundant evidence, including crime-scene photographs, DNA reports, the autopsy report of Dr. Goolsby, and two separate detailed confessions by Drain, one taken by Trooper Stanfield himself. Defense counsel had received all this material in pretrial discovery.

{¶ 115} To be sure, defense counsel could have declined to stipulate to the admissibility of the state's evidence and could have objected to much of the evidence that had been testified to by Trooper Stanfield. But in the setting of a no-contest plea, what purpose would that have served? Drain's confession to Troper Stanfield would have been admitted no matter what: it was recorded on DVD, and Trooper Stanfield himself was in court to authenticate the recording. The state would have been forced to call Dr. Goolsby, Lieutenant Santha, DNA analysts, and other witnesses, rather than presenting their reports and Trooper Stanfield's testimony. But those witnesses would presumably have testified to the same things they told Trooper Stanfield or wrote in their reports. Certainly nothing in the record suggests otherwise.

{¶ 116} So the same facts would have come before the panel in any event. The evidence would still have overwhelmingly supported a finding that Drain was guilty as charged of aggravated murder with two death specifications. Indeed, elsewhere in her brief, Drain concedes that "[t]here was no doubt about culpability in this case." Hence, the record affords us no basis to find a reasonable probability

that the result would have been different had defense counsel objected to Trooper Stanfield's testimony.

{¶ 117} Drain stresses the importance and the constitutional status of the right to confront witnesses. However, the constitutional right to confrontation is irrelevant to this analysis: Drain's plea of no contest waived it. *Boykin*, 395 U.S. at 243, 89 S.Ct. 1709, 23 L.Ed.2d 274; *Krauter v. Maxwell*, 3 Ohio St.2d 142, 144, 209 N.E.2d 571 (1965); *State ex rel. Stern v. Mascio*, 75 Ohio St.3d 422, 424, 662 N.E.2d 370 (1996).

{¶ 118} Drain also contends that her counsel were ineffective because they stipulated to the admissibility of "irrelevant" and "unduly prejudicial" information. Drain contends that some of the evidence contained information about Drain's prior crimes and "bad acts" and pejorative descriptions of Drain's character by fellow inmates. Specifically, Drain cites state's exhibit No. 40, a CD containing audio-recorded Highway Patrol interviews of inmates at the prison. Drain also cites state's exhibit Nos. 37 (a letter from Drain to the Warren County prosecutor) and 38 (Drain's confession to Lieutenant Santha) but fails to identify any specific objectionable material in either exhibit.

{¶ 119} Two of the inmate interviews contained in state's exhibit No. 40 referred to past incidents in which Drain had stabbed other inmates. However, Drain was in prison for aggravated murder when she killed Richardson, and the panel was well aware of that because it was the basis for one of the death specifications.

{¶ 120} In light of Drain's prior aggravated-murder conviction, we think it most unlikely that the past stabbing incidents affected the panel's determination of either guilt or sentence. After all, a defendant's commission of two murders is "the most powerful imaginable aggravating evidence." *Wong v. Belmontes*, 558 U.S. 15, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009). Moreover, a three-judge panel is presumed to consider only relevant, material, and competent evidence in its

deliberations. *See, e.g.*, *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 138; *Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, at ¶ 66. Hence, Drain fails to show prejudice.

{¶ 121} Drain's second and third propositions of law are rejected.

## V. SENTENCING ISSUES

### A. The Trial Court's Sentencing Opinion

{¶ 122} Drain's 12th proposition of law contends that errors in the panel's sentencing opinion denied her a fair and reliable sentencing and require that her death sentence be vacated and that this case be remanded to the trial court for resentencing. Contrary to Drain's claims, however, the sentencing opinion does not contain serious deficiencies. And even if it did, this court's independent reweighing would rectify any error. *See generally State v. Lott*, 51 Ohio St.3d 160, 170, 555 N.E.2d 293 (1990); *State v. Fox*, 69 Ohio St.3d 183, 191-192, 631 N.E.2d 124 (1994).

{¶ 123} Drain notes that the sentencing opinion does not expressly mention mitigating factors such as Drain's mental health and her history, character, and background. However, "[w]hile a sentencing court must consider all evidence of mitigation, it need not discuss each factor individually." *State v. Phillips*, 74 Ohio St.3d 72, 102, 656 N.E.2d 643 (1995). A trial court's failure to discuss each mitigating factor in its sentencing opinion does not give rise to an automatic inference that the factors absent from the opinion were not considered. *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, ¶ 54.

{¶ 124} Next, Drain argues that the trial court did not give a "detailed explanation of how it determined the weight of each [mitigating] factor it considered." No such explanation is required. *See State v. Thomas*, 97 Ohio St.3d 309, 2002-Ohio-6624, 779 N.E.2d 1017, ¶ 81, quoting *State v. Filiaggi*, 86 Ohio St.3d 230, 245, 714 N.E.2d 867 (1999) (" '[t]he weight, if any, given to a mitigating

factor is a matter for the discretion of the individual decisionmaker' " [brackets added in *Thomas*]).

{¶ 125} Next, Drain claims that the trial court improperly treated the nature and circumstances of the offense as an aggravating circumstance. Drain makes this inference from the following passage of the sentencing opinion:

> The Court has carefully considered the nature and circumstances of the offense to determine if there is any mitigating value. There is not. The crime itself was violent, intensely personal and carried out in a brutal fashion. Therefore, the Court finds no mitigating value in the nature and circumstances of the offense and therefore gives this potential mitigating factor no weight in its decision.

{¶ 126} We reject Drain's argument. As Drain concedes, the panel expressly said it had *not* "considered the nature and circumstances and/or the aggravated murder itself as aggravating circumstances." The panel examined the nature and circumstances of the aggravated murder solely to determine whether they had any "mitigating value," as it was *required* to do. *Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 128.

{¶ 127} Finally, Drain contends that the trial court failed to consider the cumulative weight of the mitigating factors. However, she cites, and we find, no language in the opinion indicating any such error on the part of the trial court.

{¶ 128} Drain's 12th proposition of law is rejected.

## B. Constitutionality of the R.C. 2929.04(A)(4) Aggravating Circumstance

{¶ 129} Drain's indictment included a death specification under R.C. 2929.04(A)(4), accusing Drain of murdering Richardson "while [Drain] was under detention." Drain pleaded no contest to this specification (along with the rest of

the indictment) and the panel found her guilty of the specification and weighed it in sentencing her to death. Drain's 11th proposition of law argues that R.C. 2929.04(A)(4) is unconstitutional.

{¶ 130} First, Drain asserts that R.C. 2929.04(A)(4) "fails to provide adequate safeguards to narrow the class of offenders to whom the death penalty can be applied." But Drain makes no attempt to provide even a rudimentary explanation for this assertion.

{¶ 131} In fact, R.C. 2929.04(A)(4) does narrow the class of aggravated murderers eligible for the death penalty. The specification requires proof of "an additional fact, independent of the elements of aggravated murder * * * before an offender is eligible for capital punishment." *State v. Barnes*, 25 Ohio St.3d 203, 207, 495 N.E.2d 922 (1986). Therefore, it "applies to a narrower group" than the group of persons convicted of aggravated murder. *Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, at ¶ 75.

{¶ 132} Second, Drain argues that the specification under R.C. 2929.04(A)(4) is unconstitutional because it "arbitrarily assigns a higher value to human life in this class of victims over others." According to Drain, the specification is "arbitrary and capricious" because "there is no legitimate reason to classify these murders committed while 'under detention' as categories worthy of special protection."

{¶ 133} A statutory classification that is rationally related to a legitimate government purpose is not unconstitutional. *State v. Thompson*, 95 Ohio St.3d 264, 2002-Ohio-2124, 767 N.E.2d 251, ¶ 13. Drain's argument lacks merit, because a rational basis exists for more severe treatment of murders committed by persons under detention. As the trial court noted in its sentencing opinion, the state "has a compelling interest in maintaining discipline and order" in Ohio's prisons and detention facilities. Murders committed by inmates impede the state's ability to safely house, guard, and provide services to inmates. The General Assembly could

rationally determine that the prospect of capital punishment makes a valuable contribution to deterring inmates from committing aggravated murder. Hence, the R.C. 2929.04(A)(4) aggravating circumstance may not be characterized as arbitrary. We reject Drain's argument and her 11th proposition of law.

## C. Repeat-Violent-Offender Specification

{¶ 134} Drain's tenth proposition of law contends that the trial court erred by sentencing her on an RVO specification attached to the same aggravated-murder count on which the trial court sentenced her to death.

{¶ 135} A "repeat violent offender," as defined by R.C. 2929.01(CC), is a person who is sentenced for one of the offenses listed in R.C. 2929.01(CC)(1)(a), which includes aggravated murder, and who was previously convicted of one of the offenses listed in that subsection.

{¶ 136} In this case, an RVO specification was attached to the aggravated-murder counts. Drain pleaded no contest to, and was found guilty of, all counts and specifications, including the RVO specifications. The trial court found Drain to be an RVO and, pursuant to that finding, imposed an additional prison term of ten years—in addition to the death penalty—for the aggravated murder of Richardson.

{¶ 137} Under R.C. 2929.14(B)(2)(a), a trial court may impose "an additional definite prison term" on a person found guilty of an RVO specification. However, R.C. 2929.14(B)(2)(a) authorizes an RVO enhancement only if the case meets "all of the * * * criteria" set forth in R.C. 2929.14(B)(2)(a)(i) through (v). In aggravated-murder cases, one of these criteria is that "*the court does not impose a sentence of death* or life imprisonment without parole" for the aggravated murder. R.C. 2929.14(B)(2)(a)(ii). (Emphasis added.) Likewise, R.C. 2929.14(B)(2)(b) authorizes an enhancement only if the case meets all the criteria set forth in R.C. 2929.14(B)(2)(b)(i) through (iii), including the criteria that the court does not impose a sentence of death or life without parole. R.C. 2929.14(B)(2)(b)(iii).

{¶ 138} Drain contends that because she was sentenced to death for the aggravated murder of Richardson, her case does not meet all the criteria of either R.C. 2929.14(B)(2)(a) or (b), and therefore the statute did not authorize the trial court to impose an RVO enhancement for the aggravated-murder count.

{¶ 139} However, as the state points out, we have held that similar sentencing claims by capital defendants are moot. Capital defendants have frequently asserted that a trial court may not impose prison sentences "consecutive to" a death sentence. And we have just as frequently overruled such claims, because "the prison sentence is rendered moot by the execution of the defendant's death sentence." *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 50. *See also State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 142; *State v. Moore*, 81 Ohio St.3d 22, 38, 689 N.E.2d 1 (1998); *State v. Bies*, 74 Ohio St.3d 320, 325, 658 N.E.2d 754 (1996); *State v. Campbell*, 69 Ohio St.3d 38, 52, 630 N.E.2d 339 (1994). The RVO enhancement in this case will likewise be rendered moot by the execution of Drain's death sentence.

{¶ 140} Drain counters that her death sentence may be vacated sometime in the future, in which case the legality of the ten-year RVO enhancement would not be moot. But this argument is doubly speculative. First, the argument assumes that Drain's death sentence will be vacated. Second, it assumes that the RVO enhancement would be improper even if Drain were to be resentenced to life, which may or may not be true. *See* R.C. 2929.14(B)(2)(a)(ii) (enhancement criterion satisfied if "the court does not impose a sentence of death or life imprisonment *without parole*" [emphasis added]) and R.C. 2929.14(B)(2)(b)(iii) (same).

{¶ 141} Drain also attempts to distinguish the cases cited by the state, arguing that those cases "had to do with the effect * * * of a *lawfully* imposed consecutive sentence when * * * a death sentence was also [imposed] upon the defendant." (Emphasis added.) Drain's description of these cases is incorrect. In each case, an appellant argued—just as Drain argues here—that a consecutive

sentence was imposed *unlawfully*, in that "the trial court lacked the authority to impose prison sentences consecutive to [a] death sentence." *Scott* at ¶ 50. *See also Lynch* at ¶ 142; *Moore* at 38; *Bies* at 325; *Campbell* at 52.

{¶ 142} Because the RVO enhancement will be rendered moot by the execution of Drain's death sentence, we reject Drain's tenth proposition of law. For the same reason, we reject the assertion in Drain's fourth proposition of law that her counsel rendered ineffective assistance by failing to object to the RVO enhancement.

**D. Lethal Injection**

{¶ 143} Drain's 14th proposition of law contends that lethal injection as administered by the state of Ohio violates the Eighth Amendment to the United States Constitution's stricture against cruel and unusual punishment. Drain argues that Ohio's current execution protocol creates a sure or likely risk of inflicting severe pain and suffering. Drain further asserts that the state's "history of botched executions" means that Ohio "cannot, and never will" be able to carry out an execution "in a constitutional manner." These claims rely on facts outside the record and are therefore not appropriately considered on direct appeal. *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 71, citing *State v. Madrigal*, 87 Ohio St.3d 378, 391, 721 N.E.2d 52 (2000). Drain's 14th proposition of law is rejected.

**VI. FAILURE TO ENSURE "COMPLETE RECORD"**

{¶ 144} Part one of Drain's sixth proposition of law contends that "[t]he trial court failed to ensure a full and complete record." But Drain fails to support this assertion.

{¶ 145} As Drain notes, "in capital cases, R.C. 2929.03(G) requires that 'the entire record' be transmitted for purposes of appellate review." *State v. Watson*, 61 Ohio St.3d 1, 14, 572 N.E.2d 97 (1991), *abrogated on other grounds by State v. McGuire*, 80 Ohio St.3d 390, 402-403, 686 N.E.2d 1112 (1997). However, in this

proposition of law, Drain does not assert that the trial court failed to transmit any portion of the record to this court; she merely repeats the claim from her third proposition of law that the stipulations were unclear. We have already rejected this claim. Moreover, an unclear record is not the same thing as an incomplete record, and only an *incomplete* record violates R.C. 2929.03(G). Drain fails to show that anything is missing from the record. Hence, we reject this part of Drain's sixth proposition of law.

### VII. CONSIDERING EVIDENCE OUTSIDE THE RECORD

{¶ 146} Part two of Drain's sixth proposition of law contends that the trial court considered facts not in evidence in determining Drain's death sentence. However, nothing in the record indicates that the trial court did any such thing.

{¶ 147} Drain argues that because the sentencing opinion lists "all 16 stipulations entered into by Drain," the trial court must have considered all of them. And, Drain reasons, since the state did not introduce evidence from all 16 categories of stipulations, the trial court must have considered evidence outside the record. While Drain describes this as a "logical conclusion," it is, in fact, mere conjecture. Part two of Drain's sixth proposition of law lacks merit.

### VIII. SETTLED ISSUES

{¶ 148} Drain's 13th proposition of law attempts to revive several arguments we rejected in *Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319.

{¶ 149} "Ohio law does not permit a jury to sentence a capital defendant if the defendant has elected to enter a plea of guilty or no contest to capital charges." *Id*. at ¶ 54. Drain contends that this rule denies a capital defendant's right to present a defense, to present mitigating evidence to a jury, and to have a jury determine the facts that make the defendant eligible to be sentenced to death. In *Belton*, we rejected each of these arguments. *Id*. at ¶ 55-61, 65-68.

{¶ 150} Drain further contends that Crim.R. 11(C)(3) is unconstitutional because it permits a three-judge panel to dismiss death specifications in the interest of justice. We have long rejected similar claims. *See Belton* at ¶ 62-64. We reject Drain's 13th proposition of law.

{¶ 151} Drain's 15th proposition of law raises several oft-rejected arguments against the constitutionality of the death penalty and the statutes governing its imposition in Ohio. *See generally State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 106, 109-120; *State v. Ferguson*, 108 Ohio St.3d 451, 2006-Ohio-1502, 844 N.E.2d 806, ¶ 85-90. This proposition of law is summarily rejected. *See State v. Poindexter*, 36 Ohio St.3d 1, 520 N.E.2d 568 (1988), syllabus; *State v. Spisak*, 36 Ohio St.3d 80, 81-83, 521 N.E.2d 800 (1988).

## IX. CUMULATIVE ERROR

{¶ 152} In her 16th proposition, Drain claims that the cumulative effect of the alleged errors in this case rendered the proceeding unfair. Under the cumulative-error doctrine, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223. However, "[a]s [Drain] offers no further analysis, this proposition lacks substance." *State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 103. *See also State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 197. Drain's 16th proposition of law is rejected.

## X. INDEPENDENT SENTENCE REVIEW

{¶ 153} In her first proposition of law, Drain contends that the death sentence imposed in this case is inappropriate and that we should reverse it upon our independent review. This proposition of law invokes our duty to independently review Drain's death sentence under R.C. 2929.05. R.C. 2929.05(A) requires that we determine (1) whether the evidence supports the trier of fact's finding of

aggravating circumstances, (2) whether the aggravating circumstances of which the defendant was found guilty outweigh the mitigating factors beyond a reasonable doubt, and (3) whether the death sentence is proportionate to those affirmed in similar cases.

## A. Aggravating Circumstances

{¶ 154} The panel found Drain guilty of two aggravating circumstances: R.C. 2929.04(A)(4), committing the crime of aggravated murder while being under detention, and R.C. 2929.04(A)(5), committing the crime of aggravated murder after having a previous conviction for the purposeful killing of another.

{¶ 155} The evidence supports the panel's findings on both aggravating circumstances. As to the specification under R.C. 2929.04(A)(5), the state introduced a certified copy of a judgment entry from the Hancock County Court of Common Pleas showing that on July 11, 2016, Drain was convicted of aggravated murder, R.C. 2903.01(A) (prior calculation and design). In the instant case, Drain stipulated that she "is the person referenced" in the Hancock County case.

{¶ 156} As to the specification under R.C. 2929.04(A)(4), Drain stipulated that "[o]n or about April 13, 2019, [she] was under detention." Moreover, the evidence showed that Drain was an inmate at the Warren Correctional Institution at the time of Richardson's murder.

## B. Mitigating Factors

{¶ 157} Drain contends that in conducting its independent review, this court must consider defendant's exhibit A, even though the defense expressly declined to place it into evidence during the penalty phase. We decline to consider it, on the authority of *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 250-254.

{¶ 158} In *Clinton*, the defendant had made an unsworn statement but introduced no other evidence in mitigation. Defense counsel submitted under seal information showing that defense investigators had thoroughly investigated

Clinton's background. The material gathered included interviews with Clinton's family and friends, his mental-health records, and other records. *Clinton* at ¶ 250. The trial court did not consider this material.

{¶ 159} On appeal, Clinton argued that this court was required to consider the sealed material, *id*. at ¶ 251, as " 'facts and other evidence disclosed in the record,' " *id*. at ¶ 253, quoting R.C. 2929.05(A). We rejected that argument, in part because "Clinton deliberately chose to present only his unsworn statement in mitigation after being fully advised of his rights to present mitigating evidence in his behalf." *Id*. at ¶ 254.

{¶ 160} Drain tries to distinguish *Clinton* by arguing that in that case, the defense presented no mitigating evidence except Clinton's unsworn statement. Here, defense counsel presented two penalty-phase witnesses in addition to Drain's unsworn statement. Therefore, Drain argues, "unlike in *Clinton*, [153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1,] Drain did not waive mitigation."

{¶ 161} Drain's argument misdescribes the facts of *Clinton*. Clinton did not simply "waive mitigation." He made an unsworn statement, which is mitigating evidence. Nevertheless, Clinton chose to withhold the mitigating evidence about his background, and thereby waived his right to have this court consider that mitigating evidence on direct appeal. *Clinton* at ¶ 253-254. Drain made the same choice—not to waive all mitigation, but to waive the specific mitigating evidence at issue here—and the same result must follow.

{¶ 162} Drain also argues that we "diverge[d] from *Clinton*" in *State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867. Drain argues that in *Madison*, defense counsel made a proffer of evidence that the trial court had excluded from the penalty phase, "yet th[is] court did not distinguish that mitigating evidence when conducting its sentencing evaluation." While Drain's point is not clear, she seems to contend that in *Madison*, this court considered the excluded evidence on independent review. But *Madison* did not involve mitigating evidence

44

that the defendant had deliberately refused to introduce. Therefore, *Madison* is fully consonant with *Clinton*.

{¶ 163} For the foregoing reasons, we decline to consider defendant's exhibit A in our independent review.

{¶ 164} However, the record also contains a report by Dr. O'Donnell as to Drain's competence to stand trial. This report was not sealed. In *Clinton*, we held that a similar report should be considered:

> Dr. Askenazi's competency report is a different matter. It is part of the record and was not filed under seal. Defense counsel submitted this report to demonstrate Clinton's competency to waive mitigation. This report reviews Clinton's family, educational, occupational, medical, substance-abuse, psychiatric/psychological, and legal history. We have considered similar evaluations in other cases. *See State v. Mink*, 101 Ohio St.3d 350, 2004-Ohio-1580, 805 N.E.2d 1064 (competency evaluations considered during independent sentence evaluation); *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93 (same). Accordingly, it is appropriate to consider Dr. Askenazi's competency report and the mitigating evidence contained therein, during our independent sentence evaluation.

*Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.2d 1, at ¶ 255. Likewise, we will consider Dr. O'Donnell's competency report in this case.

### 1. Statutory Mitigating Factors, R.C. 2929.04(B)(1) through (6)

{¶ 165} The evidence does not support the existence of any of the factors set forth in R.C. 2929.04(B)(1) through (6). Richardson, the victim, did not induce or facilitate the offense. R.C. 2929.04(B)(1). There was no evidence that Drain

"was under duress, coercion, or strong provocation." R.C. 2929.04(B)(2). Dr. O'Donnell's competency report does not support a finding that Drain, "because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of [her] conduct or to conform [her] conduct to the requirements of the law." R.C. 2929.04(B)(3).

{¶ 166} Youth of the offender, R.C. 2929.04(B)(4), is not a factor. Drain was born on June 24, 1985, and was 33 years old when she committed this aggravated murder. *Compare State v. Tench*, 156 Ohio St.3d 85, 2018-Ohio-5205, 123 N.E.3d 955, ¶ 305 (youth inapplicable to 27-year-old defendant); *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 146 (youth inapplicable to 28-year-old defendant).

{¶ 167} Lack of a significant criminal history, R.C. 2929.04(B)(5), is not a factor. And degree of participation, R.C. 2929.04(B)(6), is not a factor, as Drain was the principal offender.

### 2. Nature and Circumstances of the Offense

{¶ 168} Nothing mitigating appears in the nature and circumstances of the offense. In her second confession, Drain admitted planning Richardson's death in advance, luring him to the cell by deceit, and killing him because he backed out of a plot to kill another inmate. The killing itself was extraordinarily brutal.

### 3. History, Character, Background, and "Other Factors"

{¶ 169} Evidence in the record raises the following mitigating factors:

#### a. Troubled Childhood

{¶ 170} In an unsworn statement, Drain mentioned having suffered "traumas * * * as a child," but refused to "rehash" them. Drain claimed to have been subjected to 20 hours a day of solitary confinement as a 13-year-old juvenile offender. Therefore, she continued, "your system" had "contribut[ed] to those experiences * * * which molded me in my perceptions," and this "in itself is my choice form of mitigation."

*b. Substance Abuse*

**{¶ 171}** Drain was raised with family members who were substance abusers. Drain told Dr. O'Donnell that her substance use started with alcohol and marijuana at age 14, but Department of Youth Services ("DYS") records reviewed by O'Donnell indicated that Drain began drinking at age nine. Drain's problem quickly escalated and expanded to other substances. According to a 1997 DYS assessment, Drain met the criteria for addiction beginning at age 13.

*c. Mental Health*

**{¶ 172}** Even though the evidence does not support the lack-of-substantial-capacity mitigating factor, R.C. 2929.04(B)(3), evidence concerning a capital defendant's mental health may be considered as an "other factor" under R.C. 2929.04(B)(7). *See*, *e.g.*, *State v. Seiber*, 56 Ohio St.3d 4, 9, 564 N.E.2d 408 (1990); *State v. Reynolds*, 80 Ohio St.3d 670, 686, 687 N.E.2d 1358 (1998).

**{¶ 173}** Drain has a history of being diagnosed with severe mental illness and receiving mental-health services. Drain was once diagnosed with schizophrenia and was hospitalized in a psychiatric ward. Prison records reviewed by Dr. O'Donnell indicated that prison staff diagnosed Drain with gender dysphoria, posttraumatic stress disorder, borderline personality disorder, and antisocial personality disorder. A prison doctor described Drain as "primarily struggling with issues related to the gender dysphoria" and indicated that Drain engages in self-cutting as a way of dealing with gender dysphoria.

**{¶ 174}** On the other hand, during interviews with Dr. O'Donnell, Drain stated that she had been malingering at the time of those diagnoses. Regarding her psychiatric hospitalization, Drain told Dr. O'Donnell that she had been "manipulating 'the system' to receive benefits.

**{¶ 175}** Drain also denied to Dr. O'Donnell that she had ever seriously considered changing genders. However, Kyle Taylor, an inmate who has known Drain for years, told a state trooper during the investigation that Drain had tried to

castrate herself at her previous institution and had been assigned to the RTU at WCI because of gender dysphoria.

{¶ 176} Dr. O'Donnell concluded that Drain did not suffer from a severe mental illness or an intellectual disability at the time of the evaluation. Dr. O'Donnell found "no active symptoms present" during the three interviews she conducted with Drain for her competency report. Nor did she find any symptoms documented in the most recent 12 months of prison records covering March 2019 to February 25, 2020 (a period that includes the time of the murder). This was true even though Drain "ha[d] not been taking psychiatric medication * * * for several months." Dr. O'Donnell found Drain fully oriented and free of bizarre or obviously delusional thoughts. Drain exhibited no obvious symptoms of mania or depression, seemed emotionally stable, and denied suicidal ideation. Drain did report anxiety, chronic depression, and an inability to feel joy.

{¶ 177} We conclude that Drain's mental-health history is entitled to some weight as a mitigating factor. We assess this history, however, in the context of Drain's admission of malingering.

### d. Physical Health

{¶ 178} Drain has suffered from significant medical problems—a benign pituitary tumor, testicular cancer, and HIV. Dr. O'Donnell reported that Drain "said [she] has been 'cleared' after four cycles of chemotherapy and is no longer being treated" for the first two conditions. Drain contends that these problems deserve weight in mitigation, as they are "outside of her control" and "part of her life story." We agree that a defendant's physical-health problems can constitute mitigating evidence, but here we give them "minimal significance." *Seiber*, 56 Ohio St.3d at 9, 564 N.E.2d 408.

### e. Drain's Relationships

{¶ 179} Drain has a son and a daughter. As we discussed above, Drain refused to call her daughter as a penalty-phase witness, explaining: "I'd rather be

sentenced to death than to use the only part of me that's truly innocent and good to elicit anyone's empathy or mercy." Two other witnesses testified on Drain's behalf, however. Both asked the panel to spare Drain's life.

{¶ 180} The first of these was Shoemaker, Drain's cousin. They have been close since Shoemaker was 11 or 12 years old and have spoken to each other almost daily for years. Shoemaker testified that Drain has a close relationship with Shoemaker's nine-year-old daughter. Shoemaker looked up to Drain and regarded Drain (who is about ten years Shoemaker's senior) as an older sibling who advised her and instilled self-confidence in her. Shoemaker testified that if Drain were sentenced to death, not only would she be "a mess," but her daughter would be affected as well.

{¶ 181} Drain's other mitigation witness was Andrea Stanfield. Andrea testified that she grew up with Drain and has known Drain her whole life; their mothers were best friends. Andrea also considers Drain to be like a sibling. She spoke to Drain once a week, sometimes more. She testified that Drain is "not a monster" but a "good" and "amazing" person. She described Drain as someone who "would help anybody" and would do "anything for anybody." She said that Drain was the only person who had ever helped her and that she would readily leave her children in Drain's care.

*f. Cooperation and Acceptance of Responsibility*

{¶ 182} Drain pleaded no contest, a course of action traditionally given substantial weight in sentencing. *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 158, citing *State v. Ashworth*, 85 Ohio St.3d 56, 72, 706 N.E.2d 1231 (1999). Drain also cooperated with authorities by confessing to the murder, and her unsworn statement features an express acceptance of responsibility:

> First and foremost, I stand before you today accepting full
> responsibility. Not only for the murder of Christopher Richardson
> but for everything I've done in the past or will do in the future, good
> or bad. I myself am responsible for all of my words, actions,
> successes and failures. I blame nothing on no one for who I am and
> the things that I've done.

On the other hand, Drain also appeared to lay some blame on the justice system, in particular the juvenile judge who incarcerated her at age 13. Nonetheless, Drain's no-contest plea and acceptance of responsibility are entitled to substantial weight.

### g. Remorse

{¶ 183} Drain contends that her pleading no contest also showed remorse on her part. And indeed, a guilty or no-contest plea often does indicate remorse. *See Obermiller* at ¶ 158. However, the tone of Drain's unsworn statement leaves us in considerable doubt about Drain's remorse.

{¶ 184} While accepting responsibility, Drain repeatedly refused to apologize for her deeds and in fact stated that she stood behind them. Drain said:

> Your Honors, this is the time most people in similar circumstances
> may offer up some type of empty apology or make a pathetic plea
> for forgiveness * * *. I personally have decided to spare everyone
> involved of those fake formalities and myself, the lack of integrity
> * * *.

Evidently, Drain felt that an apology would be a mere "formalit[y]"—"empty," "fake," and devoid of "integrity." Drain added: "I stand behind the decisions I've made in my life and make *no apologies* for it." (Emphasis added.) She proclaimed: "I'm * * * accountable to *myself only*." (Emphasis added.) And she concluded:

"The killer in me is the same one inside of you and if there's a hell, I'll see you there." These sentiments hardly bespeak remorse.

### C. Weighing Aggravation against Mitigation

{¶ 185} "Killing another while an inmate and having previously been convicted of aggravated murder are grave aggravating circumstances." *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81, ¶ 129. Drain's conduct "has demonstrated that [she] is a menace to the life, health, and safety of others, even when [she] is in prison," *id*.

{¶ 186} Taken as a whole, Drain's mitigation deserves significant weight. But the aggravating circumstances in this case are so grave that they outweigh the mitigating factors beyond a reasonable doubt.

### D. Proportionality Review

{¶ 187} We have approved death sentences in several other cases in which the defendant was convicted of specifications under both R.C. 2929.04(A)(4) and (A)(5). *See Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81; *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678; *State v. Carter*, 64 Ohio St.3d 218, 594 N.E.2d 595 (1992); *Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373. Drain's death sentence is proportionate to the death sentences approved in those cases.

### XI. CONCLUSION

{¶ 188} We affirm the judgments of conviction and the sentence of death.

Judgment affirmed.

O'CONNOR, C.J., and FISCHER, DEWINE, DONNELLY, and STEWART, JJ., concur.

BRUNNER, J., concurs in part and dissents in part, with an opinion.

_____

**BRUNNER, J., concurring in part and dissenting in part.**

{¶ 189} I agree that appellant Victoria Michelle Drain's[2] convictions should be affirmed. I dissent, however, from the majority's decision to reject Drain's claims of ineffective assistance of counsel and to affirm her death sentence. Drain's attorneys provided ineffective assistance during the mitigation phase due to their failure to investigate and present mitigating evidence. I would therefore remand this case for a new mitigation hearing. Alternatively, at the very least, this court should defer ruling on Drain's ineffective-assistance-of-counsel claims until a postconviction petition has been filed, which would give this court the benefit of being able to review any evidence outside the appellate record that would support those claims.

{¶ 190} Drain argues that there was significant mitigating evidence available to her attorneys. She notes in her merit brief to this court that she experienced significant trauma throughout her life. Among other hurdles, she has been diagnosed with gender dysphoria, and in the past, she has engaged in self-harm as a way of coping with the distress associated with that condition. She has also been diagnosed with numerous serious mental-health illnesses, including borderline personality disorder, antisocial personality disorder, schizophrenia, and posttraumatic-stress disorder. She argues that her attorneys' mitigation investigation fell below professional norms, in part because counsel failed to investigate certain mitigating matters "that were readily apparent."

{¶ 191} Drain also argues that her attorneys unreasonably failed to present mitigating evidence that was in their possession. On this point, she notes that she did not waive the presentation of *all* mitigating evidence. To the contrary, she and her attorneys both presented such evidence. Drain gave an unsworn statement, and her attorneys elicited testimony from her cousin and from a life-long family friend.

---

2. During the pendency of this appeal, Drain obtained a legal name change from "Joel M. Drain."

Both Drain's cousin and Drain's life-long friend testified about positive aspects of Drain's personality and history and asked the panel not to impose a death sentence. She also acknowledges, however, that she placed several restrictions on the mitigating evidence that her attorneys could present. She did not want her attorneys to present evidence concerning her "dysfunctional" childhood or any testimony from her daughter. Drain argues that these restrictions left her attorneys free to present *other* mitigating evidence, some of which was in their possession, as reflected in defendant's exhibit A. If her attorneys had presented that evidence and if they had conducted an adequate investigation for additional evidence, there is a reasonable likelihood that she would have been spared a death sentence. *See Strickland v. Washington*, 466 U.S. 668, 669, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 192} The majority rejects Drain's ineffective-assistance-of-counsel arguments on the ground that Drain chose to prevent her attorneys from presenting any mitigating evidence beyond her statement and the two witnesses, meaning she may not claim prejudice from the lack of additional mitigating evidence now. According to the majority, "Drain's assertion that she wanted to withhold *only* her daughter's testimony and her dysfunctional childhood is inconsistent with the record [emphasis sic]," majority opinion, ¶ 77, because, in her unsworn statement, Drain stated that she did not want to "offer[] up some fake hypothetical or far-fetched medical mental health excuses." The majority opinion also relies on positions Drain took earlier in the case regarding mitigating evidence. On November 14, 2019, Drain "refused—against counsel's advice—to authorize the release of information to the mitigation specialist." *Id.* at ¶ 84. On January 2, 2020, she indicated that she wanted to waive the presentation of all mitigating evidence. Finally, on February 19, 2020, she indicated that she wanted to waive the presentation of all mitigating evidence *except an unsworn statement*. According to the majority, these positions are indicative of "Drain's desire of withholding

mitigating evidence," *id.* at ¶ 84, and are "difficult to square with Drain's current assertion that she left defense counsel free to introduce any mitigation as long as that mitigating evidence did not touch on her childhood or require testimony from her daughter," *id.* at ¶ 86.

{¶ 193} I disagree with the majority's reading of the record. As an initial matter, it is not "difficult to square" Drain's November 14, 2019, refusal to authorize the release of information to the mitigation specialist with her current argument: as the majority acknowledges, "Drain later agreed to sign the release forms," *id.* at ¶ 84. A similar change of position can be seen between her January 2 and February 19 statements. In January, she wanted to waive *all* mitigating evidence, but by February 19, she had decided to present at least an unsworn statement. Overall, these changes indicate that Drain's views on the presentation of mitigating evidence were evolving and becoming more permissive. Drain's prior statements are perfectly consistent with her current position—she wanted only to prevent her attorneys from presenting evidence pertaining to her "dysfunctional" childhood and from presenting any testimony from her daughter.

{¶ 194} I also do not agree with the way in which the majority relies on Drain's statements that she would not be "offering up some fake hypothetical or far-fetched medical mental health excuses" and that she had "not attempted to justify [her] behavior or pretend of [sic] any mental defects." These statements do not establish that Drain instructed her attorneys not to present evidence of actual mental-health diagnoses made by mental-health professionals, much less that she instructed her attorneys not to present *any* mitigating evidence except testimony from her cousin and childhood friend.

{¶ 195} There was also significant mitigating evidence available to Drain's attorneys, including evidence concerning her gender dysphoria, her mental-health issues and diagnosed disorders, her history of substance abuse, her medical history and the effect that it has had on her mental health and decision-making, and her

time spent in juvenile facilities and other facilities. This evidence also identified additional significant matters that her attorneys failed to investigate. For example, Drain points out that her attorneys never investigated the connection between her gender dysphoria and her mental health and acts of self-harm as a coping mechanism for the distress associated with that condition. Counsel also failed to conduct a further investigation into Drain's serious mental-health diagnoses and the effect her substance abuse and history of incarceration had on her decision-making.

{¶ 196} Finally, it is clear that the approximately 1,900 pages of mitigation evidence Drain's attorneys compiled and submitted to the trial court as defendant's exhibit A is not as substantial as the page count might make it seem. Two of the main documents that are pertinent to this appeal—a competency report and a psychological evaluation—were already in the record. Drain's prison records took only one public-records request to obtain. Other information—such as Drain's court records—was publicly available. And although defendant's exhibit A contains six interviews conducted by a mitigation specialist, they consisted of two interviews with Drain's mother, one with her brother, one with her cousin, one with her ex-wife, and one joint interview with her ex-wife and their two children. Given that Drain was facing a death sentence, more was required.

{¶ 197} If the mitigating evidence discussed above had been presented, its cumulative impact would have been significant and Drain likely would not have received a death sentence. She is not what is sometimes referred to as "the worst of the worst." And a full and complete investigation into the matters discussed above would only have confirmed that fact. Overall, I would conclude that the performance of Drain's attorneys was deficient due to their failure to investigate and present mitigating evidence. And given the significance that this mitigating evidence could have had in this case, there is a reasonable probability that, but for counsel's deficient performance, Drain would have been spared the death penalty. I would therefore remand this case for a new mitigation hearing.

**{¶ 198}** To the extent there is any ambiguity or uncertainty about Drain's ineffective-assistance-of-counsel claims, that ambiguity or uncertainty could be illuminated by evidence outside the record. As a result, at the very least, the majority should refrain from addressing Drain's ineffective-assistance-of-counsel claims until those claims may be explored in a postconviction proceeding, which allows for evidence outside the appellate record to be considered. *See State v. Madrigal*, 87 Ohio St.3d 378, 390-391, 721 N.E.2d 52 (2000).

**{¶ 199}** For these reasons, I concur in part and dissent in part.

_____

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio Public Defender, and Kim Rigby, Michelle Umaña, and Natalie Presler, Assistant Public Defenders, for appellant.

_____